**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CHRIS SALLEY, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TEND DENTAL, INC.,<br><br>Defendant. | **Case No. 1:26-cv-3925**<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Chris Salley ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and upon information and belief, except as to allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF ACTION

1. This is a class action brought on behalf of patients of Defendant Tend Dental, Inc. ("Defendant" or "Tend") who scheduled appointments for dental services online at www.hellotend.com (the "Website").

2. Defendant is a clinical provider of dentistry operating 33 clinics throughout the Eastern United States.[1]

3. Defendant provides multiple types of dental care, including, but not limited to, exams, cleanings, whitening, implants, braces and Invisalign, and oral surgery.[2]

[1] Tend Dental, *locations*, https://www.hellotend.com/site/search.

[2] Tend Dental, *core services*, https://www.hellotend.com/site/services; *specialty services*, https://www.hellotend.com/site/specialty-dental-services.

4. When patients schedule medical appointments for dental care, they are entitled to legal protection from the unauthorized disclosure of their personally identifiable information ("PII") and their protected health information ("PHI") to third parties.

5. Information related to dental care is protected by state and federal law, including but not limited to the Health Insurance Portability and Accountability Act ("HIPAA").[3] Healthcare providers—like Defendant—are legally required to safeguard patients' confidential and sensitive health information. These protections cover all data related to a patient's physical health, treatment history, and patient status. With these protections in place, patients have a reasonable expectation that PHI related to their physical therapy appointments will remain confidential.

6. As a medical provider that accepts payments from insurance companies, Defendant is legally obligated to protect patient privacy under HIPAA and the Privacy Rule.

7. Despite legal and ethical duties to maintain confidentiality, Defendant instead secretly intercepts and discloses Plaintiff's and Class Members' confidential health information to unknown third parties, including but not limited to Google and Mixpanel. In doing so, Defendant undermines the importance of safeguarding the identities and personal medical information of individuals seeking dental care. Moreover, it breaches the trust of their own patients and Defendant's conduct violates state and federal law.

8. Plaintiff brings this action seeking legal and equitable remedies.

---

[3] 42 U.S.C. § 1320 *et seq.*

## THE PARTIES

9. Plaintiff is an adult citizen of the State of New York, domiciled in Brooklyn. In 2020, Plaintiff began receiving dental care at Tend. Plaintiff has scheduled and attended dozens of appointments at Tend.

10. When making his appointments, Plaintiff utilized Tend's Website. Plaintiff used the same device(s) and browser(s) used to access his Google account when navigating the Website. After booking his appointments, Plaintiff began receiving targeted advertisements for similar services. However, Plaintiff did not know, and had no way of knowing, why he was receiving such targeted advertisements. Plaintiff did not know that Defendant unlawfully disclosed his PHI to third parties without his consent. Plaintiff would not have made his appointments on the Website had he known Defendant was sharing his PHI with unknown third parties.

11. When registering for his Gmail account, Google required that Plaintiff provide his full name, date of birth, and gender. Every time Plaintiff accesses his Gmail account, Google collects information related to his IP address and electronic device (*e.g.*, browser, operating system, screen resolution, etc.) and stores it in a profile maintained by Google for targeted advertising purposes. Google also utilizes other features, such as generating specific User IDs, to track its users across web browsing sessions for identification purposes, as detailed herein. Google utilizes these tracking features to build robust consumer profiles it can leverage for advertising and marketing purposes.

12. Defendant Tend Dental, Inc. is a Delaware corporation headquartered in New York, New York. Tend owns and operates www.hellotend.com, where online visitors may schedule appointments for Dental Care.

13. Defendant chose to embed Google Analytics and tracking technology from Mixpanel onto the Website, whereby Defendant intercepted and disclosed the confidential PHI of their patients to Google and Mixpanel for marketing purposes. Defendant acted without the authorization or consent of its patients in doing so.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511). Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of costs and interest, and that at least one member of the proposed class is a citizen of a state different from at least one defendant.

15. This Court has personal jurisdiction over Defendant Tend because Defendant resides within this State. Defendant has also, at all times relevant hereto, systematically and continually conducted business in this State, and has therefore intentionally availed itself of the benefits and privileges of New York law.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the stated claims occurred in this District, Plaintiff resides in this District, and the interception of Plaintiff's personal information occurred in this District.

## FACTUAL ALLEGATIONS

### A. Health Information is Sensitive and Confidential

17. Defendant intercepted and disclosed its patients' PHI to Google, one of the largest technology companies in the world.

18. Under federal law, a healthcare provider may not disclose PII or PHI without the patient's express written authorization.[4] In this case, PHI includes but is not limited to scheduling information pertaining to dental care appointments, patient status revelation, and more.

19. The United States Department of Health and Human Services ("HHS") has established a national standard, known as the HIPAA Privacy Rule, to explain the duties healthcare providers owe to their patients. "The Rule requires appropriate safeguards to protect the privacy of [PHI] and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization."[5]

20. A healthcare provider violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-d9 ("Part C"): "(1) uses of causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual."[6]

21. The statute states that an entity "shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity…and the individual obtained or disclosed such information without authorization." *Id.*

22. The criminal and civil penalties imposed by 42 U.S.C. § 1320d-6 apply directly to Defendant when it is knowingly disclosing individually identifiable health information relating to its patients.

---

[4] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 165.508(a), 164.514(b)(2)(i).

[5] U.S. Dept. of Health and Human Services, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

[6] 42 U.S.C. § 1320d-6.

23. Defendant further failed to comply with other HIPAA safeguard regulations as follows:

a. Failing to ensure the confidentiality and integrity of electronic PHI that Defendant created, received, maintained and transmitted in violation of 45 C.F.R. Section 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain and correct security violations in violation of 45 C.R.F. Section 164.308(a)(1);

c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendant in violation of 45 C.F.R. Section 164.308(a)(6)(ii);

d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. Section 306(a)(2);

e. Failing to protect against reasonably anticipated uses of disclosures of electronic PHI not permitted under privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. Section 164.306(a)(3); and

f. Failing to design, implement and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. Section 164.530(c).

24. Health care organizations regulated under HIPAA, like Defendant, may use third-party tracking tools in a limited way to perform analysis on data key to operations. They are not

permitted, however, to use these tools in a way that may expose patients' PHI to vendors (as shown below in Figures 2 through 6). As explained by a statement published by the HHS:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. **For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures**.[7]

25. The Bulletin discusses the types of harm that disclosure may cause to the patient:

> An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, **because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI only as expressly permitted or required by the HIPAA Privacy Rule.**[8]

26. Plaintiff and Class Members face exactly the risks about which the government expresses concern. Defendant's unlawful conduct resulted in third parties intercepting information regarding Plaintiff and Class Members dental care appointments while the same were being scheduled on the Website.

---

[7] HHS.gov, USE OF ONLINE TRACKING TECHNOLOGIES BY HIPAA COVERED ENTITIES AND BUSINESS ASSOCIATES (THE "BULLETIN") (EMPHASIS ADDED), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

[8] *Id.* (emphasis added).

27. The Bulletin goes on to make clear how broad the government's view of protected information is. It explains:

> This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, **or any unique identifying code**.[9]

28. Crucially, that paragraph in the government's Bulletin continues:

> All such [individually identifiable health information ("IIHI")] collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, **such as IP address** or geographic location, does not include specific treatment or billing information like dates and types of health care services. This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e., it is **indicative that the individual has received or will receive health care services or benefits from the covered entity**), and thus **relates to the individual's past, present, or future health or health care** or payment for care.[10]

29. Then, in July 2022, the Federal Trade Commission ("FTC") and the Department of Health and Human Services ("HHS") issued a joint press release warning regulated entities about the privacy and security risks arising from the use of online tracking technologies:

> The Federal Trade Commission and the U.S. Department of Health and Human Services' Office for Civil Rights (OCR) are cautioning hospitals and telehealth providers [regulated entities] about the privacy and security risks related to the use of online tracking technologies integrated into their websites or mobile apps that may be impermissibly disclosing consumers' sensitive personal health data to third parties.
>
> "When consumers visit a hospital's [regulated entity's] website or seek telehealth services, they should not have to worry that their most private and sensitive health information may be disclosed to advertisers and other unnamed, hidden third parties," said Samuel

---

[9] *Id.* (emphasis added).

[10] *Id.* (emphasis added).

> Levine, Director of the FTC's Bureau of Consumer Protection. "The FTC is again serving notice that companies need to exercise extreme caution when using online tracking technologies and that we will continue doing everything in our powers to protect consumers' health information from potential misuse and exploitation."
>
> "Although online tracking technologies can be used for beneficial purposes, patients and others should not have to sacrifice the privacy of their health information when using a hospital's [regulated entity's] website," said Melanie Fontes Rainer, OCR Director. "OCR continues to be concerned about impermissible disclosures of health information to third parties and will use all of its resources to address this issue."
>
> The two agencies sent the joint letter to approximately 130 [regulated entities] hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities. These tracking technologies gather identifiable information about users, usually without their knowledge and in ways that are hard for users to avoid, as users interact with a website or mobile app.
>
> In their letter, both agencies reiterated the risks posed by the unauthorized disclosure of an individual's personal health information to third parties. For example, the disclosure of such information could reveal sensitive information including health conditions, diagnoses, medications, **medical treatments, frequency of visits to health care professionals, and where an individual seeks medical treatment**.[11]

30. The FTC is unequivocal in its stance. Healthcare companies, like Defendant, have been informed that they should not use tracking technologies to collect sensitive health information and subsequently disclose this information to third party advertising platforms without informed consent:

---

[11] Federal Trade Commission, *FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies*, July 20, 2023, https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking. (emphasis added).

> The FTC Act prohibits companies and individuals from engaging in unfair or deceptive acts or practices in or affecting commerce. This means you must ensure your health data practices aren't substantially injuring consumers, including by invading their privacy.
>
> For instance, *BetterHelp*, *GoodRx*, and *Premom* make clear that disclosing consumers' health information for advertising without their affirmative express consent may be an unfair practice.
>
> [I]f you use behind-the-scenes tracking technologies that share consumers' sensitive health data in contradiction of your privacy promises, that's a violation of the FTC Act.[12]

31. HIPAA requires a heightened "authorization" requirement to disclose protected health information and personally identifiable information. While consent may allow certain uses or disclosures of PHI for treatment, payment, or healthcare operations, it is not sufficient for uses or disclosures that require an authorization under 45 C.F.R. § 164.508, which encompasses most uses, including marketing. *Compare* 45 C.F.R. § 164.506 (consent); *with* 45 C.F.R. § 164.508 (authorizations).

32. The HIPAA de-identification rule reaffirms the positions of the HHS and the FTC. The pertinent provisions of 45 C.F.R. § 164.514 state information is not individually identifiable only if:

> (b) Implementation specifications: Requirements for de-identification of protected health information. A covered entity may determine that health information is not individually identifiable health information only if:
>
> . . .
>
> (2)(i) The following identifiers of the individual or of relatives, employers, or household members of the individual, are removed:

---

[12] FED. TRADE COMM'N, COLLECTING, USING, OR SHARING CONSUMER HEALTH INFORMATION? LOOK TO HIPAA, THE FTC ACT, AND THE HEALTH BREACH NOTIFICATION RULE, https://www.ftc.gov/business-guidance/resources/collecting-using-or-sharing-consumer-health-information-look-hipaa-ftc-act-health-breach.

(A) Names;

(B) All geographic subdivisions smaller than a State . . . .;

(C) All elements of dates (except year) for dates directly related to an individual, including birth date, admission date, discharge date, date of death; and all ages over 89 and all elements of dates (including year) indicative of such age, except that such ages and elements may be aggregated into a single category of age 90 or older;

(D) Telephone numbers;

(E) Fax numbers;

(F) Electronic mail addresses;

(G) Social security numbers;

(H) Medical record numbers;

(I) Health plan beneficiary numbers;

(J) Account numbers;

(K) Certificate/license numbers;

(L) Vehicle identifiers and serial numbers, including license plate numbers;

(M) Device identifiers and serial numbers;

(N) Web Universal Resource Locators (URLs);

(O) Internet Protocol (IP) address numbers;

(P) Biometric identifiers, including finger and voice prints;

(Q) Full face photographic images and any comparable images; and

(R) Any other unique identifying number, characteristic, or code, except as permitted by paragraph (c) of this section; and

(ii) The covered entity does not have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information.

33. The HHS has further instructed that patient status alone is protected:

- "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

- "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which would include disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002);

- It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013); and

- The only exception permitting a hospital to identify patient status without express written authorization is to "maintain a directory of individuals in its facility" that includes name, location, general condition, and religious affiliation when used or disclosed to "members of the clergy" or "other persons who ask for the individual by name." 45 C.F.R. § 164.510(1). Even then, patients must be provided an opportunity to object to the disclosure of the fact that they are a patient. 45 C.F.R. § 164.510(2).

34. Therefore, Defendant's conduct, as described more below, violates federal law and the clear pronouncements by the FTC and HHS.

**B. Overview of Tracking Technologies**

35. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

36. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

37. Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- **<u>HTTP Request</u>**: an electronic communication sent from a device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- **<u>Cookies</u>**: a small text file that can be used to store information on the device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

- **<u>HTTP Response</u>**: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

38. A consumers' HTTP Request essentially asks the website to retrieve certain information (such as payment submissions and user selections), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

39. Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

40. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. Google Analytics and tracking technology from Mixpanel embedded on the Website by Defendant constitute Source Code.

**C. Google's Tracking Technology**

41. Google is one of the most valuable publicly traded companies in the world with a market capitalization of over $1 trillion dollars. Google fancies itself a "tech" company, but Google, at its core, is an advertising company.

42. Google "make[s] money" from "advertising products [that] deliver relevant ads at just the right time," generating "revenues primarily by delivering both performance advertising

and brand advertising."[13] In 2020, Google generated $146.9 billion in advertising revenue, which amounted to more than 80 percent of Google's total revenues for the year. Google generated an even higher percentage of its total revenues from advertising in prior years:

| Year | Total Revenue | Ad Revenue | % Ad Revenue |
|---|---|---|---|
| 2021 | $257.6 billion | $209.5 billion | 81.33% |
| 2020 | $182.5 billion | $146.9 billion | 80.49% |
| 2019 | $161.9 billion | $134.8 billion | 83.29% |
| 2018 | $136.8 billion | $116.5 billion | 85.12% |

43. Google offers several analytics products, including SDKs and a tracking pixel, which exist solely to help drive ad revenue. For instance, Google's SDK and pixel integrate with Google's advertising offerings, such as Google Ads, Search Ads 360, Google Cloud, and Google Ad Manager, to direct more individuals to use Google's ad network and products increasing Google's overall ad revenue. Products like Google's SDK and its tracking pixel also improve the company's advertising network and capabilities by providing more wholesome profiles and data points on individuals.

44. One of these SDKs and tracking pixels is Google Analytics. Google first launched a version of Google Analytics in 2005 as a tool for website traffic analysis. In 2007, Google launched Google Analytics Synchronous code with new tracking functionality, such as the ability to track commerce transactions. Two years later, Google launched the Google Analytics Asynchronous code, which allowed webpages to load faster and improved data collection and accuracy.

[13] ALPHABET INC., ANNUAL REPORT (FORM 10-K) (Feb. 2, 2021), available at https://www.sec.gov/Archives/edgar/data/1652044/000165204421000010/goog-20201231.htm.

45. Google continued updating its analytics platform, launching Universal Analytics in 2012. Universal Analytics offered new tracking codes and tools that provided more in-depth information about user behavior. Also, Universal Analytics enabled tracking the same user across multiple devices through its addition of the User-ID feature, which "associate[s] a persistent ID for a single user with that user's engagement data from one or more sessions initiated from one or more devices."

46. In 2020, Google launched Google Analytics 4, a platform combining Google Analytics with Firebase to analyze both app and web activity.

47. Since launching Google Analytics, Google has become one of the most popular web analytics platforms on the internet. Indeed, Google had a $62.6 billion increase in advertising revenues in 2021, compared to 2020, after launching its most recent version of Google Analytics.

48. Google touts Google Analytics as a marketing platform that offers "a complete understanding of your customers across devices and platforms."[14] It allows companies and advertisers that utilize it to "understand how your customers interact across your sites and apps, throughout their entire lifestyle," "uncover new insights and anticipate future customer actions with Google's machine learning to get more value out of your data," "take action to optimize marketing performance with integrations across Google's advertising and publisher tools," and "quickly analyze your data and collaborate with an easy-to-use interface and shareable reports."[15]

---

[14] *Analytics*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Jan. 10, 2023).

[15] *Id.*

49. Google Analytics is incorporated into third-party websites and apps, including the Website, by adding a small piece of JavaScript measurement code to each page on the site. This code immediately intercepts a user's interaction with the webpage every time the user visits it, including what pages they visit and what they click on. The code also collects PII, such as IP addresses and device information related to the specific computing device a consumer (or patient) is using to access a website. The device information intercepted by Google includes the patient's operating system, operating system version, browser, language, and screen resolution.

50. Once Google's software code collects the data, it packages the information and sends it to Google Analytics for processing. Google Analytics enables the company or advertiser to customize the processing of the data, such as applying filters. Once the data is processed, it is stored on a Google Analytics database and cannot be changed.

51. After the data has been processed and stored in the database, Google uses this data to generate reports to help analyze the data from the webpages. These include reports on acquisition (e.g., information about where your traffic originates, the methods by which users arrive at your site or app, and the marketing efforts you use to drive traffic), engagement (e.g., measure user engagement by the events and conversion events that users trigger and the web pages and app screens that user visits, and demographics (e.g., classify your users by age, location, language, and gender, along with interests they express through their online browsing and purchase activities).

52. In addition to using the data collected through Google Analytics to provide marketing and analytics services, Google also uses the data collected through Google Analytics to improve its ad targeting capabilities and data points on users.

53. Google Analytics links with Google Ads so that Google may use the data intercepted by Google Analytics to be utilized for targeted advertising purposes.[16] Such practices were in effect on Defendant's Website at all relevant times.

54. The Website utilizes Google's pixel and SDK. As a result, Google intercepted patients' interactions on the Website, including their PII and PHI. Google received at least "Custom Events" and URLs that disclosed the specific service sought by patients and confirmation of their appointment. Google also received additional PII, including the patients' IP address, device information, and unique identification number (Google cid).

55. In addition to User-IDs, upon receiving information from the Website, Google also utilizes a "browser-fingerprint" to personally identify individuals. A browser-fingerprint is information collected about a computing device that is used to identify the specific device.

56. These browser-fingerprints are used to uniquely identify individual users when a computing device's IP address is hidden or cookies are blocked and can provide a wide variety of data.

57. As Google explained, "[w]ith fingerprinting, developers have found ways to use tiny bits of information that vary between users, such as what device they have or what fonts they have installed to generate a unique identifier which can then be used to match a user across websites."[17]

58. The value of browser-fingerprinting to advertisers (and trackers who want to monetize aggregated data) is that they can be used to track website users just as cookies do, but it

[16] https://support.google.com/analytics/answer/9379420?hl=en#zippy=%2Cin-this-article
[17] https://www.blog.google/products/chrome/building-a-more-private-web/.

employs much more subtle techniques.[18] Additionally, unlike cookies, users cannot clear their fingerprint and therefore cannot control how their personal information is collected.

59. In 2017, researchers demonstrated that browser fingerprinting techniques can successfully identify 99.24 percent of all users.[19]

60. Browser-fingerprints are personal identifiers. Tracking technologies, like the ones developed by Google and utilized on the Website, can collect browser-fingerprints from website visitors.

61. Google collects vast quantities of consumer data through its tracking technology.

62. Due to the vast network of consumer information held by Google, matches the IP addresses, device information, browser fingerprints, and user ids it intercepts and link such information to an individual's specific identity.

63. Google then utilizes such information through targeted advertising.

**D. Mixpanel's Tracking Technology**

64. Mixpanel defines itself as: "an analytics tool that enables you to capture data on how users interact with your digital product. Mixpanel then lets you analyze this data with simple, interactive reports that let you query and visualize the data with just a few clicks."[20]

---

[18] https://www.pixelprivacy.com/resources/browser-fingerprinting/.

[19] https://ndss-symposium.org/ndss2017/ndss-2017-programme/cross-browser-fingerprinting-os-and-hardware-level-features/.

[20] What is Mixpanel?, MIXPANEL, https://docs.mixpanel.com/docs/getting-started/what-is-mixpanel.

65. Mixpanel's data model captures three main categories of information: events, users, and properties.[21] While "[a]n event is a data point that represents an interaction between a user and your product," users are the specific individual "[o]n the other side of an event."[22]

66. Mixpanel highlights that it allows clients like Defendant to track information of its website visitors.[23]

67. Mixpanel's tracking technology offers Defendant a sophisticated user analysis:




**Figure 1**

[21] *See* Data Model, MIXPANEL, https://docs.mixpanel.com/docs/getting-started/what-is-mixpanel#introduction-to-the-data-model.

[22] *Id.*

[23] What Should I Track?, MIXPANEL, https://docs.mixpanel.com/docs/getting-started/what-should-I-track.

68. Specifically, Mixpanel's tracking technology offers Defendant the ability to organize user information into "user profiles."[24] "Mixpanel's Users page aggregates and organizes a collection of user profiles. This facilitates a granular view into the behavior of individual users or groups of users.

69. The third category of information that Mixpanel catches and collects, the 'properties' of events and users, "are attributes that help [clients] define the specifics."[25] Mixpanel collects identifying factors of a user as properties. "This could be [a user's] name, email, or age."[26]

**E. Defendant Violates The Privacy Rights Of Its Patients**

70. Defendant owns and operates the Website, which offers consumers access to a variety of dental treatments, as well as the ability to schedule an appointment.

---

[24] *See generally*, Users, MIXPANEL, https://docs.mixpanel.com/docs/analysis/users; Analysis, MIXPANEL, https://mixpanel.com/analysis.

[25] Users, MIXPANEL, https://docs.mixpanel.com/docs/analysis/users.

[26] *Id.*

71. Unbeknownst to patients, Defendant embedded Google's and Mixpanel's Tracking Technologies onto the Website, which tracked patient activity, including the specific dental services they were booking appointments for. *See* Figs. 2–3.

| | |
|---|---|
| tag_exp | 115616985~115938466~115938468~119027224~119576891~119576895 |
| u_w | 2560 |
| u_h | 1441 |
| url | https://www.hellotend.com/booking/contact-info?ends_at=2026-07-02T08%3A30%3A00-04%3A00&market=new-york-city&operatory_id=0dda3bf4-f9cb-43c4-b7ad-5930656de754&patient_type=NEW&provider_id=a80a07e5-0504-422a-b271-22ad706e1787&service=CRNCON&starts_at=2026-07-02T08%3A00%3A00-04%3A00&studio=clinton-hill&who_for=self |
| ref | https://www.hellotend.com/site/home |
| rcb | 17 |
| label | cj1LCLnEp9cBEJXd9NAC |
| capi | 1 |
| frm | 0 |
| tiba | Your Details \| Booking \| Tend |
| did | dY2E1Nz |
| gdid | dY2E1Nz.dNzQzZD |
| bttype | purchase |
| value | 0 |
| hn | www.googleadservices.com |

**Figure 2 (Google)**

{"event": "Visit Booked","properties": {"$os": "Windows","$browser": "Chrome","$referrer": "https://www.hellotend.com/site/home","$referring_domain": "www.hellotend.com","$current_url": "https://www.hellotend.com/booking/contact-info?ends_at=2026-07-02T08%3A30%3A00-04%3A00&market=new-york-city&operatory_id=0dda3bf4-f9cb-43c4-b7ad-5930656de754&patient_type=NEW&provider_id=a80a07e5-0504-422a-b271-22ad706e1787&service=CRNCON&starts_at=2026-0","$browser_version": 149,"$screen_height": 1441,"$screen_width": 2560,"mp_lib": "web","$lib_version": "2.55.1","$insert_id": "qimuzbs7sqzx83ga","time": 1782668829.327,"distinct_id": "$device:19eadb19c9e4a0-06aaef99e70851-26061051-384a00-19eadb19c9e4a0","$device_id": "19eadb19c9e4a0-06aaef99e70851-26061051-384a00-19eadb19c9e4a0","$initial_referrer": "https://www.hellotend.com/site/home","$initial_referring_domain": "www.hellotend.com","Logged In": false,"New Member": true,"Chart Number": "JS9446A","Service": "CRNCON","Studio": "clinton-hill","Date/Time": "2026-07-02T08:00:00-04:00","Is Self Pay": false,"Fast intake": false,"token": "5884f7f3f39ca4d8f8d4dbf0751f071f","mp_sent_by_lib_version": "2.55.1"}},

**Figure 3 (Mixpanel)**

72. On the Website, patients may also submit an informational form to book their next appointment for dental care. *See* Fig 4.




**Figure 4**

73. Unbeknownst to its patients, however, Defendant intercepts and discloses their responses to Mixpanel.

errer": "https://www.hellotend.com/site/home","$initial_referring_domain": "www.hellotend.com","Logged In": false,"Emergency Free Form": "I have HIV","token": "5884f7f3f39ca4d8f8d4dbf0751f071f","mp_sent_by_lib_version": "2.55.1"}}

**Figure 5 (Mixpanel)**

74. In plain terms, Google and Mixpanel are told that a specific individual is seeking medical care, what they are seeking care for, and who the provider is.

75. And, to be sure, Google is aware of exactly who is requesting an appointment. In both HTTP and HTTPS communications, as shown in Fig. 2, the patient's IP address and browser fingerprint is always included in every network request. In addition, Defendant also enable Google's interception of device information and unique Google ID (cid).

76. The Google "cid" or "Client ID" is a unique identifier utilized by Google to "track [a] user['s] interactions across sessions. Its primary purpose is to uniquely identify users across sessions."[27]

77. These transmissions are disclosed by Defendant to Google in real time, via detailed URLs and event data which contain the medically sensitive information constituting PHI.

78. Defendant sent these identifiers along with each patient's "event" data, relaying their appointment request and treatment/services sought.

79. Defendant also discloses to Google a hashed version of its patients' email addresses, which it can easily use to uncover their identity:

[27] https://www.owox.com/blog/use-cases/google-analytics-client-id#:~:text=The%20Client%20ID%20(cid)%20or,unique%20users%20using%20this%20parameter.

<table>
<tr><td>tiba</td><td>Your Details | Booking | Tend</td></tr>
<tr><td>did</td><td>dY2E1Nz</td></tr>
<tr><td>gdid</td><td>dY2E1Nz.dNzQzZD</td></tr>
<tr><td>bttype</td><td>purchase</td></tr>
<tr><td>value</td><td>0</td></tr>
<tr><td>hn</td><td>www.googleadservices.com</td></tr>
<tr><td>npa</td><td>0</td></tr>
<tr><td>pscdl</td><td>noapi</td></tr>
<tr><td>auid</td><td>1917700865.1781030558</td></tr>
<tr><td>uaa</td><td>x86</td></tr>
<tr><td>uab</td><td>64</td></tr>
<tr><td>uafvl</td><td>Google%20Chrome;149.0.7827.156|Chromium;149.0.7827.156|Not)A%3BBrand;24.0.0.0</td></tr>
<tr><td>uamb</td><td>0</td></tr>
<tr><td>uam</td><td></td></tr>
<tr><td>uap</td><td>Windows</td></tr>
<tr><td>uapv</td><td>19.0.0</td></tr>
<tr><td>uaw</td><td>0</td></tr>
<tr><td>ec_m</td><td>#email*INPUT:true:18:true*1</td></tr>
<tr><td>ec_sel</td><td>#email</td></tr>
<tr><td>ec_meta</td><td>INPUT:true:18:true</td></tr>
<tr><td>ec_lat</td><td>0</td></tr>
<tr><td>ec_s</td><td>1</td></tr>
<tr><td>ec_mode</td><td>a</td></tr>
<tr><td>oid</td><td>2038506420.1782668829</td></tr>
<tr><td>oidsrc</td><td>3</td></tr>
<tr><td>ecsid</td><td>1086493529.1782668694</td></tr>
<tr><td>_tu</td><td>CBA</td></tr>
<tr><td>mt</td><td>2</td></tr>
<tr><td>gcl_ctr</td><td>3~0~0~0</td></tr>
<tr><td>gap.gtb</td><td>2</td></tr>
<tr><td>gap.last_random</td><td>1782668829290</td></tr>
<tr><td>gap.last_label</td><td>m3Z8CNzNiYEYEJXd9NAC</td></tr>
<tr><td>aecs</td><td>1</td></tr>
<tr><td>emd</td><td>tvd.1~i1.fem.ma.r18.n18.lINPUT</td></tr>
<tr><td>eme</td><td>tv.1~emkid.875cf56b-b67a-4e8f-b6c9-ec045272a3c9~ev.BM3NZkHcFKkjwt4YQWfuFN0z_gikaf9s7xvsLIhHOByjEh7n2N6kYHo2uQ5spjGRTGK0boWFfzmyngKQHsfS_CpkHffqKgVnDRo8mvmQHmPgKKCxkakxFsoKGeppuu5TCca7WRFhlwaRpssO96VqQqeNZoTrPeBV-yv8j1nnkTTU1uxA</td></tr>
<tr><td>ept</td><td>63</td></tr>
<tr><td>ct_cookie_present</td><td>false</td></tr>
<tr><td>crd</td><td></td></tr>
<tr><td>pscrd</td><td>IhMIl6K_8r6qlQMVNGbABh3uPQIuOhpodHRwczovL3d3dy5oZWxsb3RlbmQuY29tLw</td></tr>
<tr><td>is_vtc</td><td>1</td></tr>
<tr><td>cid</td><td>CAQS4gEAEQoqgTHgqYzavVDI_iKg9vzkMPa3oFFAjZ9GsxvcjzG5H2DOzfOd1Ub6CDUkADvLi2q4clvjrdZ4pjmZDpWHu58BgXQF5CTROzO9GkAN5y8_iWqjehy94rdWWBtfQGeMQ8JjTaQT2gOq7EUUCQDfQomXPcWIzMnzRczuNx9CredXLrUSlz4UgN3VyOV85IMVYGDpqnznUI_Vdu8ceVN4TzxuT05DIz-3JMt98zPPG5wjkIDuiHxKYwfCvNcsmn-Xwae0UmH84DA01sNPN71I-oydurBD80Xm4W8T88VQsTHT</td></tr>
</table>

**Figure 6 (Google)**

80. By enabling Google, Defendant targets its patients with targeted advertisements. Google also sells the information it intercepts to marketers who target Plaintiff and Class members.

81. When patients share their personal or health-related information, they expect this information to be kept confidential. Moreover, when consumers seek a specific medical consultation and/or treatment from medical professionals, they also expect this highly sensitive information to be kept confidential.

82. If patients knew that Defendant was sharing their personal information for targeted advertising purposes, they would seek services elsewhere. Through the above-listed tracking services, which Defendant used via the software code installed, integrated and

embedded into the Website, Defendant disclosed its patients' identities and sensitive medical information.

83. By installing, integrating, and embedding the above-listed tracking technologies from Google and Mixpanel (the "Tracking Technology" or "Tracking Technologies") into the Website, and by directing such installation, integration and embedding, Defendant aided and conspired with Google and Mixpanel and to contemporaneously and surreptitiously intercept the website communications of Defendant's patients without the patients' consent.

84. Defendant engaged in this deceptive conduct for their own profit and at the expense of their patients. Such disclosures are an invasion of privacy, lead to harassing targeted advertising, and violates federal privacy laws.

**E. Tolling**

85. Any applicable statutes of limitations have been tolled by Defendant's knowledge and active concealment of its incorporation of the Tracking Technologies onto the Website.

86. The Tracking Technology was and is entirely invisible to visitors of the Website, including Plaintiff.

87. Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deceptive and unlawful conduct.

88. Plaintiff was ignorant of the information essential to pursue his claims, without any fault or lack of diligence on his part.

89. Defendant had exclusive knowledge that its Website incorporated the Tracking Technologies and yet failed to disclose to patients, including Plaintiff and Class Members, that by requesting an appointment through the Website, Plaintiff's and Class Members' sensitive, private information would be disclosed or released to third parties.

90. Under these circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of customers' sensitive, private information. In fact, to present, Defendant has not conceded, acknowledged, or otherwise indicated to their patients that it has disclosed or released their PHI to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

91. Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

92. The earliest that Plaintiff, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of the Plaintiff's initial complaint in this matter.

## CLASS ACTION ALLEGATIONS

93. **Class Definition:** Plaintiff brings this action individually and on behalf of various classes of persons similarly situated, as defined below, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure. The Class Plaintiff seeks to represent is defined as: All individuals residing in the United States who scheduled an appointment for dental care on Tend's Website, www.hellotend.com, during the Class Period.

94. The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

95. Excluded from the proposed Class are Defendant; any affiliate, parent, or subsidiary of Defendant, any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant, any successor or assign of Defendant; anyone employed by

counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

96. Plaintiff reserves the right to amend the definition of the Class and/or add subclasses if further information and discovery indicate that the definition should be narrowed, expanded, or otherwise modified.

97. **Numerosity:** Members of the Class are so numerous that joinder of all members would be unfeasible and not practicable. The exact number of Class Members is unknown to Plaintiff at this time. However, it is estimated that there are at least thousands of individuals in the Class. The identity of such membership is readily ascertainable from Defendant's records and the records of third parties' Google and Mixpanel.

98. **Existence and Predominance of Common Questions of Fact and Law:** There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Class. The questions of law and fact common to the proposed Class predominate over questions affecting only individual class members. Such questions include, but are not limited to, the following:.

(a) Whether Defendant's acts and practices violate the ECPA;

(b) Whether Defendant's acts and practices violate the privacy rights of Plaintiff; and

(c) Whether Plaintiff and members of the proposed Class are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

99. **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because Plaintiff, like all other Class Members, visited the Website and had his confidential electronic communications intercepted and disclosed to third parties.

100. **Adequacy:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

101. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Class. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Finally, Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Class as a whole.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. § 2511

102. Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

103. Plaintiff brings this Count individually and on behalf of the members of the Class.

104. The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication. 18 U.S.C. § 2511.

105. The ECPA protects both the sending and the receipt of communications.

106. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

107. The transmission of Plaintiff's PII and PHI to Defendant's Website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

108. The transmission of PII and PHI between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

109. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

110. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

111. The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5).

112. The following instruments constitute "devices" within the meaning of the ECPA:

a. The computer codes and programs Defendant, Google, and Mixpanel used to track Plaintiff and Class Members communications while they were navigating the Website;

b. Plaintiff's and Class Members' browsers;

c. Plaintiff's and Class Members' mobile devices;

d. Defendant's and Google's web and ad servers;

e. The plan Defendant, Google, and Mixpanel carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website.

113. Plaintiff's and Class Members' interactions with Defendant's Website are electronic communications under the ECPA.

114. When a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to third parties at the same time as they are being sent to Defendant. This process occurs within milliseconds.

115. By utilizing and embedding the Tracking Technology provided by Google and Mixpanel on its Website, Defendant intentionally intercepted, endeavored to intercept, and/or

procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

116. Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the Tracking Technologies provided by Google and Mixpanel on its Website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and PHI.

117. Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding PII and PHI, including their identities and information related to the dental care they received. This confidential information is then monetized for targeted advertising purposes, among other things.

118. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to affiliates and other third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

119. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

120. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, HIPAA and invasion of privacy, among others.

121. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, as alleged above, Defendant violated a provision of the Health Insurance Portability and Accountability Act, specifically 42 U.S.C. § 1320d-6(a)(3). This provision imposes a criminal penalty for knowingly disclosing individually identifiable health information ("IIHI") to a third party. HIPAA defines IIHI as:

> any information, including demographic information collected from an individual, that—(A) is created or received by a health care provider ... (B) relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual, and (i) identifies the individual; or (ii) with respect to which there is a reasonable basis to believe that the information can be used to identify the individual.[28]

122. The information that Defendant disclosed to Google and Mixpanel qualifies as IIHI. Therefore, Defendant violated Plaintiff's and Class Members' expectations of privacy. Such conduct also constitutes as tortious and/or criminal conduct through a violation of 42 U.S.C. § 1320d-6. Defendant used electronic communications to increase its profit margins. Defendant specifically used the Tracking Technologies provided by Google and Mixpanel to track and utilize Plaintiff's and Class Members' PII and PHI for financial gain.

123. Defendant was not acting under the color of law to intercept Plaintiff's and Class Members' wire or electronic communications.

124. Plaintiff and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy. Plaintiff and Class Members, all of whom are patients of Defendant, had a reasonable expectation that

[28] 42 U.S.C. § 1320d-6.

Defendant would not redirect their communications to Google without their knowledge or consent.

125. The foregoing acts and omissions therefore constitute numerous violations of 18 U.S.C. § 2511(1), *et seq*.

126. As a result of each violation thereof, on behalf of himself and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq*. under 18 U.S.C. § 2520.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a. Determining that this action is a proper class action;

b. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiff as representative of the Class and naming Plaintiff's attorneys as Class Counsel to represent the Class;

c. For an order declaring that Defendant's conduct violates the statutes referenced herein;

d. For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

e. For an award of compensatory damages, including statutory damages where available, to Plaintiff and the Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

f. For punitive damages, as warranted, in an amount to be determined at trial;

g. For an order requiring Defendant to disgorge revenues and profits wrongfully obtained;

h. For prejudgment interest on all amounts awarded;

i. For injunctive relief ordering Defendant to immediately cease its illegal conduct;

j. For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

k. For an order granting Plaintiff and Class Members such further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff, on behalf of himself and the proposed Class, hereby demands a trial by jury on all claims so triable in this action.

Dated: June 30, 2026

Respectfully submitted,

By: */s/ Alec M. Leslie*

**BURSOR & FISHER, P.A.**
Alec M. Leslie
Eleanor R. Grasso
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Tel: (646) 837-7150
Fax: (212) 989-9163
E-Mail: aleslie@bursor.com
egrasso@bursor.com

Philip L. Fraietta
50 Main Street, Suite 475
White Plains, NY 10606
Tel: (914) 874-0710
Fax: (914) 206-3656
E-Mail: pfraietta@bursor.com

*Counsel for Plaintiff*